UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROBERT E. ANTOINE                                    CIVIL ACTION

VERSUS                                               NO. 10-4398

FIRST STUDENT, INC.                                  DIVISION "3"

## ORDER

On October 26, 2011, Defendant's Motion for Summary Judgment [Doc. #23] came on for oral hearing before the undersigned.  Present were Victor Farrugia and Todd McFarland on behalf of plaintiff and Magdalen Bickford and Susanne Veters on behalf of defendant.  After the oral hearing, the Court took the motion under advisement.  Having reviewed the motion, the opposition, the case law and the parties' oral arguments, the Court rules as follows.

I.      **Background**

Defendant First Student, Inc. ("First Student") was the exclusive third-party bus driver for the Jefferson Parish School Board Department of Transportation ("Jefferson Parish").  The contract between First Student and Jefferson Parish obligated First Student to staff buses for Jefferson Parish during the 2009-2010 school year.  (Def.'s Mem. Supp Mot. Summ. J., Ex. 2).

First Student was a party to a Collective Bargaining Agreement ("CBA") with Teamsters, Local 270, the bargaining unit for its bus drivers.  (*Id.*, Ex. 6).  The CBA provided that bus drivers may bid on available routes in the beginning of the school year on Bid Day by choosing the route

that they preferred in order of seniority.  (*Id.*, Ex. 6, Art. IX, § 7).  Any route or work assignment that remained unassigned following the bidding procedure would first be offered to any employee not yet assigned a route in order of seniority.  (*Id.*, Ex. 6, Art. IX, § 8).  If no driver bid on the offered route, First Student assigned the work in reverse order of seniority.  (*Id.*).  A bus driver not assigned a fixed route or work assignment after bidding was classified as a "Stand-By" driver.  (*Id.*, Ex. 6, Art. IX, § 9).[1]  "Bench" drivers drove any route that needed a substitute driver.  (*Id.*, Ex. 7 at pp. 91-93).

The CBA also provided that if an existing or new route opened after the bidding process, that route would be posted for bidding according to seniority.  (*Id.*, Ex. 6, Art. IX, § 11).  If no assigned driver bid for the existing or new route, First Student would assign the route to unassigned bench drivers in reverse order of seniority.  (*Id.*, Ex. 6, Art. IX, § 11).  The CBA also required the posting of seniority lists, and First Student posted them in the break room at its offices in Jefferson Parish. (*Id.*, Ex. 4 at p. 32).  The CBA generally prohibited the swapping of routes because it circumvented the bidding process based on seniority.  (*Id.*, Ex. 6, Art. IX, § 12).

Plaintiff has been a Seventh Day Adventist since April 1978.  (*Id.*, Ex. 7 at p. 136).  Plaintiff is currently a First Elder at the Westbank United Church.  (Pl.'s Mem. Supp. Mot. Summ. J., Ex. B at ¶ 3).  Plaintiff can not work from after sunset on Friday until after sunset on Saturday, which is the Sabbath according to Seventh-Day Adventist beliefs.  (Def.'s Mem. Supp. Mot. Summ. J., Ex 7 at pp. 144-46).

---

[1]   First Student divided its bus drivers into three categories according to seniority. "Regular" drivers were drivers who successfully bid for a route at the beginning of the school year in seniority order under the CBA.  (*Id.*, Ex. 5 at p. 9).  The bus drivers without routes were either "spare" drivers and covered for absent Jefferson Parish bus drivers or "bench" drivers who covered for First Student's drivers.  (*Id.* at pp. 9-10).

Plaintiff applied with First Student for the position of bus driver on June 23, 2009.  (*Id.*, Ex. 8).  Nowhere in writing on the employment application did plaintiff disclose that he could not work on Friday evenings after sunset.  (*Id.* at pp. 68-69; Ex. 8).

On July 1, 2009, Ella Cade interviewed plaintiff on behalf of First Student.  (*Id.*, Ex. 9 at p. 13).  First Student's Driver Interview Guide reflects that plaintiff responded at the interview that he could work between the hours of 5:00 a.m. and 6:00 p.m.  (*Id.*, Ex. 10; Ex. 7 at p. 64).  First Student considers essential the ability to work a full morning shift and a full afternoon shift until 6:00 p.m. due to the nature of the school-bus business.  (*Id.*, Ex. 9 at pp. 28-29).  Cade forwarded plaintiff's application to Location Manager Ed Franklin because plaintiff met all job requirements, according to the information that he had provided to Cade.  (*Id.* at p. 22; Ex. 10 at p. 3).

On July 23, 2009, First Student hired plaintiff as a bus driver.  Based on his hire date, plaintiff was driver number 114 of 115 on the seniority list.  (*Id.*, Ex. 11).  On Bid Day, plaintiff was unable to bid on a route due to his low seniority.  (Ex. 5 at pp. 13-14; Ex. 7 at p. 56).  Plaintiff thus became a bench driver.  As a bench driver, plaintiff had to be available to drive any First Student route that needed coverage.  (*Id.*, Ex. 7 at p. 53).

On September 11, 2009, an existing route became available.  First Student offered plaintiff Route FS651 under the reverse seniority system required by the CBA.  (*Id.*, Ex. 5 at p. 15).  Bus drivers generally completed Route FS651 between 5:45 p.m. and 5:55 p.m.  (*Id.*, Ex. 7 at pp. 77-78; Ex. 14).  Plaintiff was familiar with Route FS651 because he had driven dry-runs on the route before acceptance.  (*Id.*, Ex. 5 at p. 15).  Plaintiff accepted the route without disclosing that he would not be able to drive the route on Friday afternoons after Daylight Savings Time ended.  (*Id.* at pp. 27-28; Ex. 4 at p. 34).

Plaintiff testified at his deposition that when he drove Route FS651, he picked up between 20 and 25 children from St. Ville Academy for High School Preparation ("St. Ville") at approximately 4:30 p.m. each day.  (*Id.*, Ex. 7 at pp. 56, 58).  Driving the students home from St. Ville took approximately one and a half hours to complete.  (*Id.*, Ex. 3 at pp. 14-15).

At some point right before Daylight Savings Time ended on November 1, 2009, plaintiff informed First Student for the first time that he could not work the Friday evening shift.  (*Id.*, Ex. 7 at p. 78).  On November 6, 2009, plaintiff informed Nadia Phillips that he needed Fridays off for personal reasons.  (*Id.*, Ex. 5 at pp. 30-32).  He informed Ed Franklin that he needed Fridays off because "he had something going" and "he had a deal going."  (*Id.*, Ex. 4 at p. 24, 85).  Franklin testified that he doubted plaintiff's religious belief because of the numerous conflicting statements that plaintiff had made about the reason for which he could not work on Friday evenings.  (*Id.*, at p. 91).

Franklin worked with First Student's General Support and Employee Relations Manager, Danny Guerdon, and the Union to accommodate plaintiff's request for Friday afternoons off.  (*Id.*, Ex. 4 at p. 36; Ex. 17).  Plaintiff testified at his deposition that he sought three possible accommodations: (1) to be assigned a shorter route; (2) to be allowed to drive the first two schools on his afternoon route; or (3) to return to bench-driver status.  (*Id.*, Ex. 7 at p. 70, 86).

Franklin eventually recommended to plaintiff that he swap his Friday afternoon route with a volunteer or to find a volunteer to cover the Friday afternoon route.  (*Id.*, Ex. 4 at pp. 36, 109-10).  To remain in compliance with the CBA, which prohibited swapping, First Student sought to negotiate a commitment from the Union to consider a side agreement to the CBA to accommodate plaintiff once the parties had ironed out the details.  (*Id.*, Ex. 1 at pp. 35-37).  Plaintiff knew the

4

names of all of the other bus drivers from the seniority list posted on the office bulletin board.  (*Id.*, Ex. 4 at p. 32).  Plaintiff ultimately failed to find a driver to volunteer to take his route.  (*Id.* at pp. 95-97).

Moneik Lee, a more senior driver, approached plaintiff and volunteered to pick up the students at the last school on one or two Friday afternoons for him.  (*Id.*, Ex. 18 at pp. 13-17).  Franklin informed Lee that she would have to take over plaintiff's entire route should she wish to help him, and Lee ultimately declined.  (*Id.* at pp. 14-16).

Plaintiff testified that he asked Percy Washington, a bus driver who also picked up students at St. Ville, if he could add plaintiff's students to his bus route on Friday afternoons when Lee was unavailable.  (*Id.*, Ex. 7 a pp. 97-98).  Plaintiff believed that Washington could simply load plaintiff's St. Ville students on Washington's bus and double his route to take them home.  (*Id.*).  Plaintiff testified that he did not know whether his suggested accommodations were compliant with the CBA or the agreement between First Student and Jefferson Parish.  (*Id.* at p. 99).  Franklin testified that plaintiff never mentioned Washington to him.  (*Id.*, Ex. 4 at p. 142).  Plaintiff also testified that he understood that any suggestion to return him to bench-driver status would not have allowed him to leave every Friday afternoon before sunset.  (*Id.*, Ex. 7 at pp. 91-92).

First Student reviewed its bench-driver staffing to ascertain whether coverage through bench drivers was theoretically possible until the beginning of Daylight Savings Time but ultimately concluded that it did not have sufficient bench drivers to designate one to plaintiff's route and that safety concerns prohibited it.  (*Id.*, Ex. 4 at pp. 137-38, 141).

Between November 6, 2009 and January 15, 2010, different bench drivers covered plaintiff's route on Friday afternoons.  (*Id.*, Ex. 19).  On November 20, and December 4, 2009, all bench

drivers were assigned routes to drive on Friday afternoon. (*Id.*).

Plaintiff failed to report to work for his Friday afternoon shifts on November 6, 13, 20, December 4 and 11, 2009. (*Id.*, Ex. 20). First Student then counseled plaintiff for absenteeism, suspended him and finally terminated him for excessive absenteeism and disobedience under the CBA and First Student's absenteeism policy in its employee handbook. (*Id.*, Ex. 21).

On November 23, 2010, plaintiff sued defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that First Student discriminated against him on the basis of his religion and that First Student failed to reasonably accommodate his religious beliefs. On March 20, 2011, plaintiff and First Student consented to proceed before the undersigned under 28 U.S.C. § 636(c). [Doc. #11]. First Student now moves for summary judgment on all of plaintiff's claims.

## II.     The Parties' Contentions

### A.     First Student's Motion for Summary Judgment

First Student assumes *arguendo* and for purposes of this motion that plaintiff can establish a *prima facie* case of religious discrimination. First Student roots its motion in the fact that First Student offered plaintiff a reasonable accommodation that he ultimately declined. Noting that the CBA prohibited it from (1) assigning plaintiff to a shorter route, (2) forcing another driver to switch routes with plaintiff, (3) route-swapping and (4) arranging a route assignment outside of the strict seniority and route-bidding system, First Student argues that it reasonably accommodated plaintiff when it informed plaintiff that he could swap his Friday afternoon route with a volunteer or find a volunteer to cover the route. Citing case law, First Student argues that the effects of a seniority system, in and of itself, can not constitute a violation of Title VII. First Student also contends that

it had no duty to breach its obligations under the CBA to accommodate plaintiff's religious beliefs. First Student asserts that should the Court find that it reasonably accommodated plaintiff's religious beliefs, the inquiry ends there.

Only if the Court disagrees with First Student's argument that it reasonably accommodated plaintiff's religious beliefs, First Student contends, should the Court consider whether no other reasonable accommodation could be offered without imposing an undue hardship on First Student. First Student argues that assigning plaintiff to a shorter route or forcing a shift swap would violate the CBA and its embedded seniority system. Citing case law, First Student maintains that undue hardship occurs when the proposed accommodation would force changes in the schedules of other employees, alter the employer's otherwise neutral procedure, such as a seniority system or a neutral rotating-shift schedule, or interfere with CBAs.

First Student also maintains that scheduling bench drivers to cover plaintiff's Friday afternoon shifts through the end of Daylight Savings Time constituted more than a *de minimis* burden because First Student did not always have a sufficient number of bench drivers, and, on several occasions, non-driving staff members may have had to cover routes because of plaintiff's absence.

First Student further contends that it and Jefferson Parish disfavored the use of bench drivers to cover routes due to the increased safety risk to the children. Jefferson Parish demanded consistent transportation because "consistent transportation is safe transportation." (Def.'s Mem. Supp. Mot. Summ. J., Ex. 3 at p. 46). For example, First Student notes, substitute drivers would often not know the children on the bus and the drop-off point for each child. (*Id.* at pp. 15-17). The use of

7

substitute drivers, argues First Student, elevates the safety risk to children.  (*Id.*, Ex. 1 at p. 109).[2]

First Student also maintains that plaintiff's suggestion that he be returned to the position of a bench driver violated its employment practices and the CBA, which did not allow regular drivers to vacate their route and become bench drivers.  First Student also notes that even had it adopted this suggestion, plaintiff would have still had to work until 6:00 p.m. if assigned to a late route.  First Student notes that even plaintiff recognized that bench drivers were required to drive any route that needed coverage.  (*Id.*, Ex. 7 at pp. 53, 91).

Splitting plaintiff's Friday afternoon route with another driver would also have constituted more than a *de minimis* hardship because Jefferson Parish prohibited First Student from splitting routes.  (*Id.*, Ex. 4 at p. 37).  In addition, First Student would have had to compensate two drivers for the same shift.

First Student ultimately argues that availability from 5:00 a.m. to 6:00 p.m. to drive children was an essential function of plaintiff's employment.  First Student maintains that plaintiff misrepresented his availability to it during the interview process.  As a Seventh-Day Adventist for over 30 years, first Student notes, plaintiff knew that he could not work past 5:00 p.m. once Daylight Savings Time ended.

### B.    Plaintiff's Opposition

Plaintiff notes that he began to work for First Student in 2008 in the Orleans Parish unit. (Pl.'s Mem. Supp. Mot. Summ. J., Ex. A at pp. 38-40; Ex. 7).  Plaintiff contends that he had no

---

[2]    First Student notes that shortly before the dispute arose here, Jefferson Parish was sued when a substitute bus driver dropped a child off on the wrong side of the street, and the child ran into traffic. *Winston v. Denis Fruchtnicht, et al.*, No. 665-083 (24th Judicial District Court, State of Louisiana, Jan. 16, 2009).

conflict in his work schedule when he worked for the Orleans Parish unit because he completed his Friday afternoon route at approximately 4:40 p.m. (*Id.* at 40-42). Plaintiff thus argues that he had no reason to foresee that he would have a conflict with shifts in Jefferson Parish that concluded after Daylight Savings Time had ended.

Plaintiff notes that after he informed First Student that he was a Seventh-Day Adventist, he attended two meeting with Franklin and the union shop steward, Judith Jackson. At the first meeting, Jackson attests that Franklin informed plaintiff that he would try to resolve the conflict between plaintiff's religious beliefs and his schedule. (*Id.*, Ex. E at ¶ 6). At the second meeting, on November 6, 2009, Franklin gave plaintiff a warning letter for not driving his afternoon route that day. (*Id.* at ¶ 7). He also told plaintiff that if he could not drive all three schools on Friday afternoon, he should stay home and not return to work at all on that afternoon. (*Id.*).

Plaintiff asks the Court to deny summary judgment based on disputed material facts as to whether (1) First Student's purported reasonable accommodations violated the CBA, relied on a memorandum of understanding ("MOU") never made with the union, and wholly failed to eliminate, or even reduce, the work-religion conflict, (2) use of the CBA provisions for Voluntary Route Changes would cause any undue hardship to First Student, and (3) continuation of the use of bench drivers to cover plaintiff's four remaining Friday afternoon routes at issue constituted undue hardship.

Plaintiff argues that Franklin's testimony that he told plaintiff to find a volunteer to swap routes with him is controverted by the testimony of Judith Jackson. Jackson provides a declaration in which she attests that the outcome of the second meeting was that Franklin and the dispatchers would find a volunteer to swap routes with plaintiff. (*Id.*, Ex. B at ¶ 10). Plaintiff argues that any

9

attempt to swap routes violates the CBA and is thus not a reasonable accommodation.  Plaintiff notes that the union never agreed to a side-agreement or MOU on behalf of plaintiff.  Pointing to First Student's position paper before the Equal Employment Opportunity Commission ("EEOC"), plaintiff notes that there is no mention in the paper of any opportunity for plaintiff to swap routes. (*Id.*, Ex. 7).  Plaintiff also notes that in the position paper, First Student alleges that plaintiff received off the first two Friday afternoons after he mentioned his religious beliefs.  Plaintiff contends that this is inconsistent with marking these two Fridays as unexcused absences on his part.

Citing case law, plaintiff contends that an accommodation that only *partly* eliminates the conflict between work and religion is not a reasonable accommodation.  Plaintiff notes that First Student failed to find a driver to swap routes with plaintiff, and, even had it done so, such swapping would have violated the CBA.

Plaintiff contends that unpaid absences were available and imposed no undue hardship on First Student.  In other words, plaintiff alleges that one means of accommodating an employee who is unable to work on a particular day due to a religious conviction is to allow the employee to take unpaid absences.  Plaintiff argues that First Student recognized this accommodation when it covered plaintiff's Friday afternoon routes with bench drivers and did not pay plaintiff.  He maintains that he complied with all company policies regarding absences by notifying his supervisor of the absence no later than the night before the absence and the reason for it.

Plaintiff asserts that Jefferson Parish's Director of Transportation, Lynn Alello, testified that there are absent drivers every day and that it is a normal part of the business to have substitute drivers on the bus.  (*Id.*, Ex. I at p. 54-55).  Alello also testified that substitute drivers do not endanger the lives of the children.  (*Id.* at p. 55).  Plaintiff also notes that First Student saves money

when a bench driver substitutes for plaintiff.  Plaintiff loses three hours of pay, but First Student loses none because a bench driver earns the same amount of money whether he drives a bus or sits on the bench waiting all day for an absence.

Plaintiff contends that the availability of these unpaid absences, coupled with their successful use to accommodate him in November and December 2009 without any noticeable hardship, coupled with the fact that he only needed coverage by bench drivers for four more Fridays for a period of three weeks past his termination date, and coupled with the fact that no one complained about the bench drivers substituting for him renders summary judgment inappropriate.

Citing the CBA, plaintiff argues that the "Voluntary Route Changes" ("VRC") section would have reasonably accommodated plaintiff.  Under that section, First Student would post the route and advertise it for three consecutive weeks.  After the advertising, a senior driver could pick the route.  First Student would then assign plaintiff to the route of the driver who chose plaintiff's route. Jackson attests in her deposition that she would have chosen plaintiff's route had First Student advertised it.  (*Id.*, Ex. E at ¶ 11).[3]  Plaintiff would have then had her route – which generally ended at approximately 4:45 p.m.[4]

Plaintiff contends that First Student has not met its burden here.  Plaintiff argues that First Student has advanced only hypothetical hardships unlikely to materialize and not certain-to-occur hardships as required by the case law.  For example, plaintiff notes that despite First Student's allegation that it did not have enough bench drivers, First Student adequately covered plaintiff's route on six Fridays.

---

[3]      Jackson was 19 out of 115 in seniority.

[4]      At oral argument, counsel for plaintiff argued that approximately 77 per cent of routes ended before 5:00 p.m.

###### C.      First Student's Reply

First Student contends that plaintiff's allegation that First Student did not ask him to find a volunteer is contradicted by his own actions.  First Student points out that plaintiff testified that he approached Percy Washington to take his shifts.  Lee also testified that plaintiff told a big group of drivers that he needed someone to cover his shifts.

First Student also argues that plaintiff's assertion that a voluntary shift swap could not have been a reasonable accommodation because it would have violated the CBA merely supports its main argument – that no accommodation was possible without undue hardship.  That plaintiff disputes that the union would have agreed to the MOU, First Student contends, does not render the fact disputed that it had such a preliminary MOU with the union.

First Student maintains that it tried to accommodate plaintiff's request by allowing voluntary shift swaps on Friday evenings.  Citing case law, First Student contends that an employer does not have to incur undue hardship and that "absolute accommodation" is not required under Supreme Court precedent.  First Student argues that binding precedent holds that the attempt to find a volunteer is a reasonable accommodation when a CBA mandates shift assignments by seniority and prohibits the employer from unilaterally implementing shift swaps.

With respect to undue hardship, First Student maintains that replacing plaintiff with bench drivers for his final four shifts would only have been a temporary solution because the same conflict would have arisen each year.  First Student contends that it is pure speculation that – had it reassigned plaintiff to a bench-driver position – the dispatchers would have been able to assign him to a route that ended before 5:00 p.m.  First Student asserts that asking it to change its essential job requirements – *i.e.*, working until 6:00 p.m. – to accommodate his religious beliefs is not a

reasonable accommodation in and of itself.

First Student disputes that unpaid absences would not have imposed an undue hardship.  First Student notes that continual transportation by bench drivers increases the safety risk to the children, strains First Student's relationship with Jefferson Parish and increases the administrative effort to use bench drivers for long-term religious accommodation at the risk of being short-staffed in cases of absences due to emergencies.

First Student contends that the argument that it had a duty to use the VRC procedure in the CBA is no more than hypothetical.  First Student points out that under the CBA, the *driver* must vacate his position in order to implement the VRC.  Plaintiff never informed First student that he wanted to vacate his route.  That Jackson would have accepted plaintiff's route is a hypothetical scenario created by plaintiff after the fact.  First Student notes that Jackson never simply offered to switch her routes with plaintiff in her meetings with Franklin and plaintiff.  Driving Jackson's route, First Student notes, would not have eliminated the conflict in any event because the sun set before 5:05 p.m., the time at which Jackson's route typically ended.

First Student asserts that plaintiff's argument that it had adequate bench drivers to staff all of his routes is incorrect.  As even plaintiff notes, on two out of seven Friday evenings, all bench drivers were assigned routes.

## III.    Law and Analysis

### A.    Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A court must be satisfied that no reasonable trier of

fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [his] favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324.   The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

### B.    Title VII

Title VII of the Civil Rights Act of 1964 provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion."  42 U.S.C. § 2000e-2(a)(1).  A claim for religious discrimination under Title VII can be asserted under several different theories of liability, including disparate treatment, disparate impact, and failure to accommodate. *See, e.g., Lee v. Conecuh County Bd. of Educ.*, 634 F.2d 959 (5th Cir.1981) (involving claims of disparate treatment and disparate impact).

To establish a *prima facie* case of religious discrimination under Title VII, a plaintiff must

establish that he had a bona fide religious belief that conflicted with an employment requirement, that he informed the employer of his belief, and that he was discharged for failing to comply with the conflicting employment requirement. *Weber v. Roadway Express*, 199 F.3d 270, 273 (5th Cir. 2000) (citing *Brener v Diagnostic Ctr. Hosp.*, 671 F.2d 141, 144 (5th Cir. 1982)). For purposes of this motion, First Student assumes – as will this Court – that plaintiff can establish a *prima facie* case of religious discrimination.

Because a *prima facie* case of religious discrimination exists for purposes of this motion, the burden shifts to First Student to demonstrate that it was unable to reasonably accommodate plaintiff's needs without undue hardship. *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 144 (5th Cir. 1982). An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees but is not required to incur undue hardship. *Eversley v. MBank Dallas*, 843 F.2d 172, 175 (5th Cir. 1988). "Undue hardship" exists, as a matter of law, when an employer is required to bear more than a *de minimis* cost. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (emphasis in original); *Brener*, 671 F.2d at 146.

Whether an employer has reasonably accommodated an employee's religious beliefs is a question of law. *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001). Under this prong of the analysis, the Court "is not concerned with the question of undue hardship *per se*, but with the reasonableness of [First Student's] attempts to accommodate [plaintiff's] religious beliefs." *Ford v. City of Dallas, Tex.*, Civ. A. No. 3:05-CV-1676, 2007 WL 2051016, *3 (N.D. Tex. July 12, 2007). Once First Student establishes that it offered plaintiff a reasonable accommodation, even if that alternative is not his preference, it has, as a matter of law, satisfied its obligation under Title VII. *See id.* Title VII does not restrict an employer to only those means of accommodation that are

preferred by the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) ("By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation."); *see also Equal Emp't Opportunity Comm'n v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990) ("Offered an accommodation [that is reasonable], the employee cannot insist upon a specific or more beneficial one."); *Eversley v. MBank Dallas*, 843 F.2d 172, 176 (5th Cir. 1988) (same).

As noted above, First Student contends that it reasonably accommodated plaintiff when it informed plaintiff that he could swap his Friday afternoon route with a volunteer or find a volunteer to cover the route. The Court finds that no genuine issue of material fact exists with regard to the legal issue whether First Student attempted to reasonably accommodate plaintiff's religious beliefs. Time and time again in the case law, accommodations such as those offered plaintiff by First Student have been upheld as reasonable in the context of religious discrimination, and, specifically, in the context of a conflict between a plaintiff's religious belief and working on the Sabbath. In *Hardison*, for example, the Supreme Court upheld a district court's finding that the defendant-employer had attempted to reasonably accommodate the plaintiff's religious conflict after the employer (1) held several meetings with the plaintiff at which it attempted to find a solution to the problem; (2) accommodated his special religious holidays; and (3) authorized the union steward to search for someone to swap shifts with plaintiff. 432 U.S. at 77. Here, First Student held at least two meetings with plaintiff in an attempt to resolve the conflict and offered to seek an MOU with the union that would allow plaintiff to swap shifts in contravention of the CBA and the seniority system. That the union may not have consented to the MOU is of no moment: What matters here is that First Student was willing to seek an MOU on plaintiff's behalf in order to accommodate his religious beliefs. *See*

*id.* at 78 (noting that the employer was willing to work out a shift or job trade but union was not).

In *Brener*, the employer used a rotating shift scheduling system that allowed the plaintiff-pharmacists to create their own schedules amongst themselves. 671 F.2d at 143.  After the plaintiff informed the defendant-employer that he could not work certain shifts that conflicted with the Sabbath, the employer informed him that it would not direct another employee to swap shifts with the plaintiff but that it would approve of any exchange in shifts.  *See id.* at 144.  The plaintiff failed to find a co-employee to swap shifts with him, and he ultimately resigned, suing his employer under Title VII.  *See id.*

Such a factual situation mirrors the one that exists here.  First Student offered plaintiff the opportunity to find a volunteer to swap routes with him, and, by plaintiff's own admission, he attempted to do so when he approached both Washington and Lee.  First Student had no obligation to unilaterally force another employee to cover plaintiff's routes in contravention of the CBA.  *Hardison*, 432 U.S. at 79; *Brener*, 671 F.2d at 146-47.  In addition, the Fifth Circuit has never required an employer to rearrange its schedule and force employees to swap shifts to accommodate the religious practices of an employee.  *Weber*, 199 F.3d at 274-75.  Such a practice constitutes an undue hardship on First Student in and of itself.  *See id.* at 273-74.  Allowing plaintiff to do so, however, by agreement between plaintiff and a co-employee and a potential MOU with the union is a reasonable accommodation.[5]

Once First Student offered plaintiff such a reasonable accommodation, plaintiff was under the obligation to exploit it as best that he could:

---

[5]    In *Brener*, the Fifth Circuit ultimately concluded, *inter alia*, that directing other employees to trade shifts with the plaintiff inflicted undue hardship on the employer because it disrupted work routines and lowered morale among the other pharmacists.  671 F.2d at 146-47.

> [B]ilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer. A reasonable accommodation need not be on the employee's terms only.

*Brener*, 671 F.2d at 145-46.  By his own admission, plaintiff attempted to secure a volunteer to swap shifts with him. Indeed, plaintiff had the names of all of the bus drivers from the seniority list posted on First Student's office bulletin board. First Student can not be faulted that no employee would or could swap with him.  Neither is the Court convinced that plaintiff took full advantage of First Student's offer of reasonable accommodation.  Of the 115 drivers on the seniority list, plaintiff approached only two before suing First Student:  Lee and Washington.  This, in and of itself, is inadequate.

Plaintiff attempts to distinguish *Hardison*, *Brener* and *Weber* by noting that the scheduling systems and any CBA or MOU in those cases are different from the ones at issue here.  The Court rejects plaintiff's attempt to distinguish the cases.  In *Beadle v. Hillsborough County Sheriff's Department*, the Eleventh Circuit rejected a similar argument:

> Beadle attempts to distinguish the Court's holding in *Hardison* by arguing that there the Court was speaking not of a neutral rotating shift system, but rather of a "bona fide seniority system." While we recognize that *Hardison* specifically concerned the sufficiency of a seniority system under Title VII to determine employee eligibility for weekends off, we are not persuaded that the Court intended that its holding apply only to those systems. Rather, our reading of *Hardison* suggests that the Court was concerned primarily with the neutrality of the system utilized.

29 F.3d 589, 593 (11th Cir. 1994).  This Court agrees.  It is undisputed that First Student operates under a neutral seniority system and a bargained-for CBA.  Plaintiff makes no argument that either discriminates by itself.  Accordingly, the Court can not find the aforementioned case law inapposite simply because the employers in those lawsuits may have used a slightly different but still neutral

18

scheduling system than First Student.

At oral argument, plaintiff relied on *Ford v. City of Dallas*, 3:05-CV-1676, 2007 WL 2051016 (N.D. Tex. July 12, 2007), to support his argument that a genuine issue of material fact exists here with regard to whether First Student reasonably accommodated his religious beliefs. The Court finds *Ford* inapposite. There, the district court held that defendant had failed to adduce evidence to carry its burden to demonstrate that it had reasonably accommodated the plaintiff and that it had failed to establish that the accommodations were otherwise sufficient as a matter of law. *Id.* at **3-4. The *Ford* court determined that the defendant made only unsubstantiated assertions to support its defenses. *See id.* at *3. Here, however, the Court has cited the evidence in the record submitted by First Student to establish that no genuine issue of material fact exists with regard to First Student's reasonable accommodation. *Ford* is thus distinguishable.

Because the Court finds that First Student attempted to reasonably accommodate plaintiff's religious beliefs, the Court need not reach the question of whether any accommodation suggested by plaintiff would pose an undue hardship on First Student. *Ansonia Bd. of Educ.*, 479 U.S. at 69 ("Once the Court of Appeals assumed that the school board had offered to Philbrook a reasonable alternative, it erred by requiring the Board to nonetheless demonstrate the hardship of Philbrook's alternatives.").[6] In short, because First Student offered a reasonable accommodation to plaintiff, the Court need not determine whether First Student has demonstrated undue hardship in light of plaintiff's proposed alternative accommodations. *See id.*; *see also Beadle*, 29 F.3d at 593 (noting that the inquiry ends once "a reasonable accommodation was afforded the employee").

---

[6]    The Court notes here that plaintiff's argument that First Student's concerns are too hypothetical and speculative are without merit. Federal law does not require an employer to wait until it feels the effect of an accommodation before it decides that an undue hardship is present. *Weber*, 199 F.3d at 275.

**IV.    Conclusion**

For the reasons outlined above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [Doc. #23] is

GRANTED.

New Orleans, Louisiana, this 4th day of November, 2011.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**